IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 08 – 22772 – CIV - KING



FILED by _____ D.C.

MAR 0 1 2010

STEVEN M. LARIMORE
CLERK U. S. DIST. CT
S. D. of FLA. – MIAMI

VISTA VIEW APARTMENTS, LTD.,

        Petitioner,

vs.

CHUBB CUSTOM INSURANCE COMPANY,

        Respondent.

_____/

## PETITIONER VISTA VIEW'S MEMORANDUM OF LAW AND FACTS IN OPPOSITION TO RESPONDENTS MOTION TO CONFIRM PORTIONS OF APPRAISAL AWARD

The Petitioner, VISTA VIEW APARTMENTS, LTD., by and through its undersigned counsel, pursuant to Southern District of Florida Local Rule 7.1, files this Memorandum of Law and Facts in Opposition to Respondent Chubb's Motion to Confirm Covered Portions of Appraisal Award and Memorandum of Law[1] in Support and states:

1.     This matter arises from a commercial insurance claim under a policy of insurance issued to the Petitioner to cover its residential buildings by the respondent. On or about December 30, 2007, a plumbing line failure occurred at the Petitioner's condominium complex that resulted in a backup causing damage to the Petitioner's buildings.

---

[1] The Respondent cites Florida Statute 682.12 (commonly known as the Florida Arbitration Code) as applicable law for its motion. The Florida Supreme Court and District Court of Appeals have repeatedly held that said code is not applicable to appraisal cases. See Allstate Ins. Co. vs. Suarez, 833 So. 2d 762, 763-66 (Fla. 2002); see Cotton States Mut. Ins. Co. vs. D'Alto, 879 So. 2d 67, 70 (Fla. 1st).

2.      The Petitioner promptly reported the claim to the Respondent and the claim process commenced.  The Respondent investigated the Petitioner's claim and while admitting coverage under the terms of the insurance policy made payment to the Petitioner in the amount of $18,810.81 after the applicable policy deductible of $5,000.

3.      This amount was insufficient, the Petitioner learned, to return the Respondent's buildings to their condition prior to the aforementioned loss.  The Respondent contended that the damage to the Petitioner's buildings was caused by the clogging of grease within the plumbing line that could be remedied by a cleaning and/or "snaking" of the sewer line.

4.      The Petitioner contended that the cause of the sewer backup was in reality a break (or as later learned perhaps multiple breaks) in the sewer line that could only be remedied by the replacement of the plumbing lines that are failed.  The Petitioner thereafter obtained an estimate of the cost to repair the damaged caused by the failed plumbing lines which vastly exceeded the cost estimate prepared by the Respondent.

5.      With a clear disagreement as to the cost necessary to complete the necessary repairs to its buildings, and in accordance with the terms of the insurance contract issued by the Respondent, the Petitioner invoked the appraisal provision contained in said contract.

6.      The Respondent refused to commence the appraisal process and name its respective appraiser in accordance with the terms of the contract.

7.      The Respondent filed this action to compel the appraisal of its loss in accordance with the terms of its contact with the Respondent.

8.      After conducting Case Management and Summary Judgment hearings, this court granted the Petitioner's Motion for Summary Judgment (DE 26) and ordered that an appraisal of the loss commence.   In accordance with well established Florida law, the appraisal panel determined the amount of the loss while simultaneously determining that the cause of the loss is covered under the subject policy of insurance.  Such a determination is squarely within the role of the appraisal panel and must be upheld by this court *See Johnson vs. Nationwide Mutual Ins. Co.*, 828 So. 2d 1021 (Fla. 2002).

9.      On December 21, 2009, the appraisal panel **unanimously** executed an Appraisal Award which determined the damage sustained to the Petitioner's buildings to be $916,691.63.

10.     In determining the amount of damage sustained to the Petitioner's buildings the appraisal panel engaged the services of an independent plumbing contractor who confirmed, the findings of the prior inspections conducted by both representatives of the Petitioner and Respondent, that the cause of the backups which the buildings experienced was due to a plumbing line break within its plumbing system.  In its Motion, the Respondent sets forth no rational legal basis to not confirm the appraisal award as required by Florida law.  The amount of the appraisal award, pursuant to the terms and conditions of the subject insurance contract, is binding upon the parties as stated in the policy of insurance contract. The policy specifically states: "Agreement by the umpire and either of the appraiser's will be binding on us." DE 20, Page 4, ¶7.

11.     In paragraph eight of the Respondent's Motion, the Respondent argues that the Petitioner is only entitled to the ACV portion of the award claiming that the necessary repairs were not done and therefore the actual cash value payment provisoon of

the policy should govern. However, the Petitioner has already incurred the expense of full repairs. The buildings were sold and a full credit for the repairs was issued to the buyer. Therefore, the Petitioner should be entitled to the replacement cash value amount reflected in the award.

12.      In paragraph nine of its Motion, the Respondent attempts to mislead the court into believing that there exists no break in the plumbing lines. However, nothing could be further from the truth. On January 20, 2009, during inspection ordered by this Court by the Respondents experts TDT Plumbing, Inc. and Exponent, Inc. it was confirmed to the undersigned by way of a video inspection and later documented in their report that breaks were present in the plumbing lines. Exponent's report specifically noted that tree roots had ruptured the plumbing lines. This was established by the video inspection. Interestingly, this information is somehow overlooked by the Respondent in their present motion. Moreover, the report reflects that the video discovered other areas where either the bottom portion of the pipe had ruptured or areas depicting "pipe separation." The Petitioner finds it incredulous that the Respondent would overlook their own expert's reports. A true and correct copy of Exponent Inc.'s report is attached hereto and incorporated as Petitioner's Exhibit "A." In addition, perhaps most important is the fact the Respondent is attempting to inject facts into the record that are not substantiated by affidavit nor reflected in any report that the Petitioner is aware of. Nothing in the report prepared by the plumber retained by the appraisal panel supports the various self-serving conclusions contained in the Respondent's Motion. To put simply, a backup caused by a broken plumbing line would be the non-excluded peril which would trigger coverage for the Petitioner's loss, including the tear out provision as contained in the

policy of insurance. This is why the Respondent goes to great strides to hide the fact that an actual break in the pipes occurred coupled with the back up that occurred which establishes the coverage for the Petitioner's loss.

13.    In paragraph twelve of its Motion, the Respondent attempts to again mislead the court as to statements purportedly made by the undersigned. While it is true that the undersigned indicated in his opinion believed that the cost of the <u>actual pipe itself</u> was not covered, there was nothing more said or even suggested. The Petitioner has never suggested that the cost to access the plumbing system would not be covered. In fact the undersigned, during the summary judgment hearing read into the record the policy provision requiring the insurer to indemnify the insured for any costs associated  with the tear out and replacement.  The policy in pertinent part states:

> **Costs to Tear Out and Replace Parts of Building**
> If loss or damage caused by or resulting from the escape of water or other liquid powder or molten material occurs and such escape is caused by or results from a peril not otherwise excluded, we will pay for the cost to tear out and replace any part of a building to repair or replace a system or appliance from which water or other substance escapes. (DE 22 Exhibit A at A00062).

Specifically, the case at bar deals with water that escaped thru the plumbing system, in addition the Respondent acknowledged/admitted the claim and tendered payment in the amount of $18,810.81. The payment was made for damages which occurred as a result of water escaping from a plumbing system (sewer back up). DE 46 Page 2 Paragraph 2. Important to point out this language comes from the Respondent themselves therefore the loss in question stems from a peril not otherwise excluded. Clearly invoking the tear out provision noted above.

14.     The Respondent argues in its motion a portion of the loss is not covered by the insurance policy and that excluded coverage's should be determined by the Court and not by appraisal panel. Such a proposition is directly in conflict with established Florida law. In *Johnson*, the Florida Supreme Court held that when an insurer admits or does not wholly deny there is a covered loss, causation is an amount-of-loss question to be determined by the appraisal panel, not a coverage issue to be decided by the court. Id. at 1022. Such is clearly the situation in the case at bar. When the Respondent did not wholly deny the Petitioner's claim, the claim became ripe for the appraisal process as contained in the subject insurance contract. Therefore, the award as determined by the appraisal panel must be upheld.

## Memorandum of Law

This case was removed by the Respondent based on diversity of citizenship pursuant to 28 U.S.C. § 1332 (DE 1); therefore, the substantive law of Florida controls. *See Grupo Televisa, S.A. vs. Telemundo Communications Group, Inc.*, 485 F. 3d 1233, 1240 (11th Cir. 2007) (holding that the a court sitting in diversity will apply the conflict of law rules of the forum state).

This Court in its Order granting the Petitioner's Motion for Summary Judgement (DE 26) enforced the appraisal provision of the insurance contract that was issued by the Respondent to the Petitioner. The provision states:

> If you and we do not agree on the amount of loss or damage, either party may make a written demand for an appraisal of the loss or damage, in this event, you will select and pay a competent and impartial appraiser, and we will select and pay a competent and impartial appraiser. The two appraisers will select an umpire. If the appraisers cannot agree on an umpire, either may request that a judge of a court having jurisdiction make the selection. Each appraiser will separately state the value of the property and the amount of the loss or damage. If the appraisers do not agree, they will submit their statements to the umpire.

6

> Agreement by the umpire and either of the appraisers will be binding in you and us. (emphasis added) (DE 26, P. 2)

After this Court ordered the appraisal process to commence in accordance with the terms of the insurance contract, appraisers were appointed by both the Petitioner and Respondent. It was determined that an agreement could not be reached by the respective appraisers and thus Umpire David Gale was selected to serve as the umpire. Thereafter, an award was entered unanimously. That is the appraisal award was signed by all members of the appraisal panel, including the appraiser for the Respondent, Sanford Siegel. With his affirmation of the appraisal award, one can only conclude that Mr. Siegel believed the award reflected an accurate amount of damage in accordance with the terms and conditions of the insurance contract. Yet despite the fact its own appraiser executed the award, the Respondent is attempting to inappropriately alter said award.

While the Respondent, in its motion, goes to great strides to distinguish what its believes is covered portions of the claim and non-covered portions, it once again fails to recognize that such a determination has already been made and it binding upon the Respondent. It seems that yet once again the Respondent is attempting to undo the rulings which this Court has already made in this case. These rulings are based solely upon established Florida law and must be upheld. This Court in granting the Petitioner's Motion for Summary Judgment (DE 26) found that the "question of causation must be left to the appraisers" (DE 26 ¶ 6). This Court is citing the Florida Supreme Court case of *Johnson vs. Nationwide Mut. Ins. Co.,* 828 So. 2d 1021, 1022 (Fla. 2002) noted, "Causation is a coverage question for the court when an insurer wholly denies that there is a covered loss and an amount-of-loss question for the appraisal panel when an insurer admits that there is a covered loss, the amount of which is disputed." (DE 26 ¶ 6). Such a

scenario is indistinguishable to the facts of the case at bar. It is undisputable that the highest court of a state is the final arbiter of what is state law. When it speaks, its pronouncement is accepted as defining state law unless it later gives clear and persuasive indication that its pronouncement is modified. *See West vs. American Tel. & Tel Co.,* 311 U.S. 223 (1940). Therefore, this Court correctly found that the law as pronounced by the Florida Supreme Court in *Johnson* applies hereto. When the Respondent made the determination that coverage existed for the Petitioner's loss (in the words of the *Johnson* court did not wholly deny the Respondent's claim) and made a payment as indemnification for the loss, the question of causation became ripe for the appraisal panel in the event either party moved for an appraisal of the loss (DE 26 P. 4). This Court has previously interpreted the appraisal provision of the subject policy of insurance to unambiguously allow either party to request an appraisal to determine the amount of the Petitioner's loss. The Petitioner having invoked the appraisal provision and this Court having ordered the parties to complete the appraisal process, the amount of loss, as determined by the appraisal panel is binding upon both parties and the appraisal award must be confirmed. That is to say the issue of causation (and therefore coverage) has already been determined by the appraisal panel when it rendered its award. It is the role of appraisal panel's umpire to consider the arguments of the appraisers appointed by the insurer and insured and in accordance with the terms and conditions of the policy of insurance render an award. When the insurer has determined the coverage exists for a loss (the claim is not wholly denied), but the disagreement is solely upon the amount of loss, the appraisal process, once invoked when either party, is binding upon both the insurer and insured. What is most fascinating about the Respondent's current motion is

8

that counsel for the Respondent at the hearing held before this Court on the Petitioner's

Motion for Summary Judgment (DE 29), actually cited *Johnson* in her argument for the

proposition that the appraisers are to conduct an inspection and render an award <u>already</u>

<u>excluding</u> that items which are non covered.  Ms. Ebenfeld stated:

> Ms. Ebenfeld: In the Johnson versus Nationwide Florida Supreme Court case,
> there was coverge for the claim whatsoever.  But in that Florida Supreme Court
> case, the court explained the previous case law including the Supreme Court's
> decision in Lycea (ph) and stated "when an insurer admits there's a covered loss
> but there is disagreement on the amount of loss," and I'm reading from the
> Johnson case on page 1025, "the appraisers are to inspect the property *and sort*
> *out how much is to be paid on account of a covered peril.  In doing so, they are to*
> *exclude payment for a cause not covered, such as normal wear and tear, dry rot*
> *or various other designated excluded causes*." (emphasis added) (DE 29, p. 4-5).

Therefore, the Petitioner finds it perplexing that Chubb is attempting to do exactly what

its own counsel said could not be done just a weeks prior to the commencement of the

appraisal process.  In rendering its awards, the most experienced and capable appraisal

panel rendered an award which only included those items it determined to be covered

under the policy of insurance and excluding those items which are not covered.  Even

more interesting is the fact that the exclusions that the Respondent cites in its motion

(wear and tear, dry rot, etc.) to now exclude coverage are the very same exclusions that

Ms. Ebenfeld cited the appraisal panel are to determine exist or do not exist in rendering

its award!

The Respondent in its motion is attempting to find coverage for certain portions of the

appraisal award but find other portions without coverage.  It is well established under

Florida law that an insurer simply cannot do so.  In *Three Palms Pointe, Inc. vs. State*

*Farm Fire & Casualty*, 362 F. 3d 1317 (11th Cir. 2004), the United States Court of

Appeals for the Eleventh Circuit held that when an insurer does not wholly deny a claim

9

and insurer and an insured party go to appraisal, the insurer can only dispute coverage for "the loss as a whole." Id. at 1318. The court held in *Three Palms Pointe* in citing the Florida Supreme Court case of *State Farm Fire & Casualty Co. vs. Licea*, 685 So. 2d 1285 (Fla. 1996) wherein the court found that the appraisal clause in an insurance policy was valid despite the unilateral nature of the retained rights clause, but only to the extent that the clause allowed the insurer to dispute coverage for the claim as a whole, and not anything less. Id. at 1288. That is, the court in *Licea* found that once an appraisal award has been made, the only defenses that remain for the insurer to assert are lack of coverage for the entire claim or violation of one of the standard policy conditions (fraud, lack of notice failure to cooperate, etc.)—none of which the Respondent have failed and are not an issue in the facts of the case at bar. The court in *Three Palms Pointe* went on to say that the insurer could not challenge a <u>part</u> of the appraisal award. *Licea* clearly established that such a challenge is not permitted. The court concluded that since the appraisal occurred, exactly as in the facts of the case at bar, the insurer could not seek to challenge coverage with respect to part of the award on appeal. Id. at 1319. In doing so, the court affirmed the confirmation of the appraisal award by the District Court which should similarly be done in this matter.

Finally, in what could not be clearer authority with facts duplicative of the case at bar, the Florida Third District Court of Appeal in the matter of *Kendall Townhomes Developers, Inc. vs. Agricultural Excess and Surplus Lines Insurance Co.*, 916 So. 2d 12 (Fla. 3d DCA 2005), while discussing both *Johnson* and *Licea*, stated as follows:

> [1] The insured has raised numerous arguments in support of the contention that the trial court erred by affirming the appraisal*15 award, but we address only two of the arguments. First, the insured argues that pursuant to *Johnson vs. Nationwide Mutual Insurance Co.*, 828 So. 2d 1021, (Fla. 2002), <u>causation of the</u>

damage is a coverage issue reserved for the trial court, not the appraisal panel. We disagree. (emphasis added)

In *Johnson*, the Florida Supreme Court reviewed two cases that were directly in conflict, *Nationwide Mutual Insurance Co. vs. Johnson*, 774 So. 2d 779 (Fla. 2d DCA 2000), and Gonzalez vs. State Farm Fire & Casualty Co., 805 So. 2d 814 (Fla. 3d DCA 2000). In *Nationwide Mutual*, the insurer argued that the damage was a result of an excluded cause, earth movement, whereas Johnson argued that the damage was the result of a covered cause, a sinkhole. The Second District held that "causation is an amount of loss issue for the appraisal panel." *Nationwide Mut.*, 774 So. 2d at 781.

In *Gonzalez vs. State Farm*, Gonzalez submitted a claim to its insurer for cracks in the walls and tiles of the property. Gonzalez asserted that the damage was attributable to a covered cause, blasting in the area. The carrier, however, denied coverage based on its position that the damage was a result of an excluded cause, minor settling of the foundation. Gonzalez filed suit against the insurer and demanded an appraisal. The trial court allowed the appraisers and umpire to decide whether the damage to the walls and tiles was a result of blasting or as a result of minor settling of the foundation. The insurer's appraiser and the umpire determined that the damage was a result of the settling of the foundation, and awarded Gonzalez zero damages. The trial court confirmed the appraisal award, and entered a final judgment in favor of the insurer. On appeal, this court reversed, finding that "the appraisers impermissibly decided whether the entire claim was within the coverage of the insurance policy." *Gonzalez vs. State Farm*, 805 So. 2d at 815.

The Florida Supreme Court resolved the conflict by adopting the following analysis set forth by Judge Cope in *Gonzalez:*

Very simply, the *Licea* court was saying that when the insurer admits that there **is** a covered loss, but there is a disagreement on the amount of loss, it is for the appraisers to arrive at the amount to be paid. In that circumstance, the appraisers are to inspect the property and sort out how much is to be paid on account of a covered peril. In doing so, they are to exclude payment "for a cause not covered, such as normal wear and tear, dry rot, or various other designated, excluded causes."
FN2. *State Farm Fire & Cas. Co. vs. Licea*, 685 So. 2d 1285 (Fla. 1996).

Thus, in the *Licea* situation, if the homeowner's insurance policy provides coverage for windstorm damage to the roof, but does not provide coverage for dry rot, the appraisers are to inspect the roof and arrive at a fair value for the windstorm damage, while excluding payment for the repairs required by preexisting dry rot.

In the present case (unlike *Licea*) State Farm says that there is not coverage for the claim whatsoever, while the homeowners say that the claim falls within an applicable coverage.  Whether the claim is covered by the policy is a judicial question, not a question for the appraisers.

*Johnson*, 828 So. 2d at 1025, (footnote added; emphasis in original; citations omitted).  Based upon this analysis, the Florida Supreme Court held that "causation is a coverage question for the court when an *16 insurer wholly denies that there is a covered loss and an amount-of-loss question for the appraisal panel when an insurer admits that there is covered loss, the amount of which is disputed." *Johnson* at 1022.

In the case at hand, the insurance carrier agrees that there is a covered loss, but disagrees as to the amount of loss.  Therefore, based on *Johnson* although there is a large discrepancy between the insured's and insurance carrier's estimate of the loss, because the insurer has not wholly denied that there is covered loss, causation is an "amount of loss question for the appraisal panel," not a coverage question that can only be decided by the trial court.  Accordingly, we agree with the insurance carrier that pursuant to *Johnson*, it is permissible for an appraisal panel to decide causation issues when causation is not a coverage question, but rather an amount-of-loss question. (916 So. 2d at 15-16)

WHEREFORE, based upon the clear authority of *Johnson*, *Licea*, and *Kendall*

*Townhomes*, and the arguments contained herein, the Petitioner respectfully requests this

Court enter an Order denying the Respondent's Motion to Confirm Covered Portions of

Appraisal Award,  confirm the appraisal award entered by the parties, enter a judgment

against the Respondent and in favor of the Petitioner in the amount of $916,691.63 minus

the prior payments of $18, 810.81 (which payment had already subtracted the $5,000

deductible) and $42,738.31 for a grand total of $855,142.51, award attorney fees and

costs in connection with the defense of Respondent's motion and any other relief deemed

equitable and just.

Respectfully submitted,

By: _____
Leo A. Manzanilla
Florida Bar. No. 0652921
Law Offices of Leo A. Manzanilla, P.A.
770 Ponce de Leon Blvd., Suite 101
Coral Gables, Florida  33134
Telephone: (305) 444-1887
Facsimile:  (305) 666-8427
leo@manzanillalaw.com
Attorney for Petitioner

## CERTIFICATE OF SERVICE

The undersigned certifies that and true and correct copy of the above and forgoing

Motion for Summary Judgment was served by US Mail on this ⎳ day of March, 2010,

to Cindy L. Ebenfeld , Hicks & Kneale, P.A., attorneys for Respondent, 11011 Sheridan

Street, Suite 104, Cooper City, Florida  33024.

By: _____
Leo A. Manzanilla

# EXHIBIT "A"

Exponent

*Failure Analysis Associates*

David P. Wills, P.E.
Managing Engineer

dwills@exponent.com

Exponent
4101 SW 71st Avenue
Miami, Florida 33155

telephone  305 661 1000
facsimile    305 669 0305
www.exponent.com

April 7, 2009

**RECEIVED**

APR 0 8 2009

HICKS, PORTER,
EBENFELD & STEIN, P.A.

Ms. Cindy Ebenfeld
Hicks, Porter, Ebenfeld & Stein, P.A.
799 Brickell Plaza, Suite 900
Miami, Florida, 33131

Via E-Mail: cebenfeld@mhickslaw.com
Telephone:  305 374 8171

**Ref.:  Vista View Apartments, Ltd. V Chubb Custom Ins. Co.
Miami-Dade County Circuit Court Case No. 08-51075 CA 02
Exponent Project No. 0805157**

Dear Ms. Ebenfeld:

Thank you again for retaining Exponent, Failure Analysis Associates, Inc. (Exponent) to assist you on the above-referenced investigation.

**OVERVIEW:**

This investigator has reviewed the file materials provided by you and/or others as follows:

- Vista View Brochure
- Four video inspection disks produced by A&I Plumbing (A&I), December 26, 2007 (SEA disk copies labeled "Prior to SEA Inspection" have been provided to Exponent).
- TDT report of February 6, 2008
- SEA report of March 19, 2008 (and two associated SEA video disks of the sewer inspection conducted Feb 1, 2008).
- Statewide Septic Connection report of June 30, 2008 (and four associated SEA video disks labeled "After SEA Inspection").

Exponent has conducted two inspections of the Vista View property located at 17098 Collins Ave., Sunny Isles Beach, Florida 33160. Exponent's preliminary inspection was conducted on September 9th, 2008. This visit consisted of a walk-through and a brief meeting with Gedale

0805157/A000/0409/DW02

Ms. Cindy Ebenfeld
April 7, 2009
Page 2

Fenster of PICC, the public adjustor for Vista View and Vista View staff. During this inspection, documents that memorialize the flooding event and response to it were requested.

A follow-up inspection was conducted on January 20 and 21, 2009, along with TDT Plumbing & Drains. During this two-day inspection, additional video documentation of the sewer system was conducted. This included inspections of all the common underground sewer piping within the footprint of the buildings as well as representative vertical pipe inspections from the roof vents.

**CHRONOLOGY:**

In an effort to better understand the activities and timing of various activities, the following timeline has been established. Dates (for the chronology only) are listed as Year.Month.Day. The source of information is bracketed as follows: {Information Source}.

07.12.26 thru 28: A&I conducted video of sewers (SEA Disks labeled "Prior to SEA Inspection" have been provided to Exponent). These disks show lots of standing water and lots of grease buildup in the sewers.

07.12.30: Sewer backup that affected all four residential buildings is reported {SEA report, page 1}.

08.02.01:  SEA and TDT conducts video drain inspections for Chubb {TDT report of 08.02.06 and SEA report, pages 2 & 6}.

08.02.06:  TDT issues report.

08.03.19:  SEA issues report.

08.06.03:  A&I Enterprises of South Florida, Inc., issues a letter report to People's Insurance Claim Center that provides some dates when they responded to the property to provide relief from sewer stoppages. This letter advises replacement of the underground sewer lines.

08.06.27:  Statewide Septic Connection conducted hydro-jetting of all four systems apparently from the roof stacks to the mainline. An invoice for $2600 is in the file.

08.06.30:  Statewide Septic Connection issues report of condition based on recent inspection. Issue date on report is apparently incorrect, as the video inspection of 08.07.02 is discussed in the report.

08.07.02:  Statewide Septic Connection inspected the sewers with a video device {Statewide Septic Connection report, page 1}. (SEA Disks labeled "After SEA Inspection" have been provided to Exponent).

Ms. Cindy Ebenfeld
April 7, 2009
Page 3

08.07.28:  People's Insurance Claim Center, Inc submitted four documents of estimates for the restoration/service/remodel of the four buildings as follows:
A total: $84.8K
B total: $70K
C total: $70K
D total: $84K
Total: $301K

08.08.19:  Exponent is hired.

08.09.09:  Initial inspection by Exponent.

09.01.20:  Two-day sewer inspection by TDT and Exponent.

**GENERAL DISCUSSIONS AND OBSERVATIONS:**

Exponent reviewed documents and videotape of inspections conducted by others. Unfortunately, it was frequently difficult on video supplied by others to identify the location(s) where the video was introduced into the sewer system. In addition, the buildings were occupied residential structures during all of the inspections (including Exponent's inspection). As a result, sewage flow was present in the system. The video scope technique functions both in air and underwater, but one's ability to see underwater is limited by the turbidity of the effluent in the sewer pipes in locations where the video head was submerged.

The sewer lines contained lots of grease during most of these inspections. Grease floats on water. It looks light or white on the video screen. It is primarily present on the upper interior surfaces of the pipe, and can frequently be seen piled up on each side of the flowing effluent stream. Grease buildups restrict the capacity of a sewer and have the potential to cause a blockage in a sewer system. It is notable that the inspection disks from the July 2, 2008 inspection conducted by Statewide Septic Connection show a much cleaner sewer system than at other times, presumably due in large part to the hydrojet cleaning conducted on June 27th, 2008, just a few days before the video inspection was conducted.

There were also many locations within the buildings where the horizontal sewer lines appear to have inadequate or incorrect slope. At these locations the pipes may fill completely with effluent. This reduces flow rates locally, allowing solids to settle out of the effluent, and can lead to blockages.

There were many locations within the buried horizontal sewer lines under the buildings where the inspection scope blacked out during the inspection. This was typically in conjunction with high (local) effluent levels in the pipe. These locations may be low spots in the pipe in which sludge settles, or they may be locations where the bottom of the pipe has corroded away (hereafter called a "bottom out" condition), allowing the video scope to nose into the soil, thereby blacking out.

Ms. Cindy Ebenfeld
April 7, 2009
Page 4

When the bottom of a gravity sewer pipe is compromised in this way, the sewage typically continues to flow through the line, but is subsequently flowing over a surface partially comprised of soil and/or sand rather than a pipe wall. Some of this soil and/or sand is invariably carried down the pipe with the effluent flow. This can lead to a loss of sand/soil at the location of the failed pipe bottom. Settlement of the local soil and sewer pipe can result, causing the sewer pipe to locally reside at a lower elevation than when it was originally installed. An active sewer will subsequently hold water at such a location, even if it were originally installed with a constant downhill slope that drained uniformly as originally designed and installed.

The gravity sewer system under the Vista View buildings is seen to be holding water at many locations during the various video inspections. It is unlikely that the pipes were originally installed with such low spots in the system.

Exponent also conducted inspections of a representative number of vertical lines inside buildings A & B, entering the system through the rooftop vents. These lines were scoped vertically until they turned and joined the horizontal underground sewer system. No breaks or breaches of these vertical lines was detected.

## OBSERVATIONS AT SPECIFIC LOCATIONS WITHIN THE SEWER SYSTEM:

Building A
47 TO 49 feet west of cleanout 1 (outside at the east end of building) in building A: video image went completely black. This may be a location where the bottom has corroded out of the pipe and the video head was in the soil.

6 TO 9 feet west of cleanout 2 (east end of atrium) in building A: video image went completely black. This may be a location where the bottom has corroded out of the pipe and the video head was in the soil.

12 TO 20 feet downstream of cleanout 3 (southwest corner of atrium) in building A: video image went completely black. This may be a location where the bottom has corroded out of the pipe and the video head was in the soil.

13 feet west of cleanout 4 (west end of atrium at the elevator doors) in building A: There is apparently a root entering the sewer from above. There is also a possible pipe break at this location.

14 TO 20 feet west of cleanout 4 (west end of atrium at the elevator doors) in building A: video image went completely black. This may be a location where the bottom has corroded out of the pipe and the video head was in the soil.

Building B

Ms. Cindy Ebenfeld
April 7, 2009
Page 5

5 feet west of cleanout 2 (east end of atrium) in building B:  There is apparently a root entering the sewer from above.

7 feet west of cleanout 2 (east end of atrium) in building B:  There is apparently a root entering the sewer from above.

Building C
East of cleanout 3 (southwest corner of atrium) in building C:  Heavy grease buildup, blockage.  A sewer snake was used by TDT to clear blockage.  Hot water was run in unit C-102 for approximately 20 minutes.

5 feet east of cleanout 4 (at elevator doors in east end of atrium) in building C:  There is a possible pipe separation at this location.

Building D
2 feet east of cleanout 1 (east end of hallway at east end of building) in building D:  There is apparently a root entering the sewer from above.

28 feet east of cleanout 1 (east end of hallway at east end of building) in building D:  There is apparently a root entering the sewer from above.  There may also be a fractured pipe at this location.

38 TO 45 feet east of cleanout 2 (NW corner of atrium) in building D: video image went completely black.  This may be a location where the bottom has corroded out of the pipe and the video head was in the soil.  When the video head emerges from black, it is pointed up and to the side.

**VISTA VIEW INCIDENT OF DECEMBER 30, 2007**

Vista View claims to have had an incident (apparently on December 30, 2007) when all four buildings suffered sewer backups that flooded portions of the first floor.  I have requested documentation of this incident and of the remedial plumbing response that provided relief.  I have been provided only the A&I report of June 3, 2008.  This provides very little information.  This report states "In December 2007, our company was initially called to clear stoppages from said location.  Using a "snake" the stoppages were cleared with a large amount of sand granules found on the "snake" cable…"  The report also indicates dates in 2008 when A&I responded to the apartments.

The A&I report provides no information about any specific date in December of 2007 or of any blockage that caused backups in all the buildings.  A single blockage that affected all the buildings would have to have occurred in the main drain between the final manhole (west of the west end of building A) and the city sewer to the north.  Alternatively, each of the four buildings may have individually suffered blockages associated with the sewer deficiencies noted and restriction(s)

Ms. Cindy Ebenfeld
April 7, 2009
Page 6

caused by grease buildups seen during the inspections.  The date of the reported incident is on a
Sunday, with New Year's Eve and New Year's Day following.  This may have been a time of high
flow due to the weekend and holiday activities.


**BACKGROUND DISCUSSION ABOUT CAST IRON SEWER PIPES:**

Exponent conducted some research to determine the likely service life of an iron pipe sewer system.

Numerous examples of very long service life of gray cast iron pipe in water service were found in
the literature.  These include examples of hundreds of years of service such as in the pipeline
between Marle-on-Seine and Versailles (France) that supplies water for the fountains of the city of
Versailles.   The demonstrated corrosion resistance (in water, not sewer service) and the inherent
strength and crush resistance, provide strong support for the use of cast iron pipe in water service.

Much of the longevity of cast iron pipe in water service can be attributed to the formation of
calcareous deposits on the inside of the pipe that provided an effective barrier coating that slows the
corrosion rate of the iron.

The sewer service application present at the Vista View is much different than water service.
Service life predictions of a piping system must consider both the material and the environmental
conditions.  When compared to water, sewage effluent is anticipated to have a much wider range of
chemistry, conductivity, pH, temperature, entrained solids, microbial action and so forth, and
therefore a much greater disparity in corrosive behavior.

In sewer service, calcareous deposit formation does not typically occur.  If placed into service
uncoated, cast iron would therefore be expected to corrode at a rate that is equal to or greater than
its corrosion rate in water without the protection of calcareous deposits.

Literature searches were conducted for appropriate theoretical/experimental documentation of
corrosion rates of iron.  Several examples were found.  Uhlig[1] has published a graphical
relationship of corrosion of iron in water at various pH levels.  This plot predicts a corrosion rate of
approximately 0.01 inches per year (ipy) for iron in contact with aerated soft water at room
temperature across a broad pH range from approximately 2.5 to 13.  Another corrosion rate
prediction for different types of iron is provided by F. L. LaQue[2] who provides nearly identical
corrosion rates of 0.028 ipy for unalloyed ferritic gray iron and 0.029 ipy for ductile iron immersed
in a 3 1/2 % sodium chloride and water solution (sea water).  He further indicates that the corrosion
rates of various types of iron were similar in tests conducted in fresh water.

Exponent has in the past contacted the Ductile Iron Pipe Research Association and spoke with one
of their regional engineers.  When asked about the availability of published service life information

---

[1] Uhlig and Revie, *Corrosion and Corrosion Control*, p. 96.
[2] LaQue, F.L. *Corrosion Resistance of Ductile Iron*, p. 58.

Ms. Cindy Ebenfeld
April 7, 2009
Page 7

on cast iron or ductile iron in sewer service, he indicated that little information would likely be
found, and sighted the diverse range of exposures present in sewer service.

**DISCUSSION AND CONCLUSIONS:**

The apparent failure of the bottom cast iron piping at locations at Vista View is clearly associated
with the effluent flowing inside the pipe. The partial or total loss of the bottom of the pipe in
horizontal runs is not an uncommon failure mode in iron gravity sewer pipe where the pipe most
often is not completely full of effluent (see photo 3). The bottom inside surface of the pipe remains
wet. In addition, the bottom inside surface experiences some abrasion from the fluid flow and any
solids in the waste stream and from the occasional use of sewer cleaning equipment. The upper
portions of the pipe wall interior surface, which are rarely wetted by sewage typically, corrode at a
slower rate that is more consistent with the atmospheric corrosion rate of iron.

The sewer piping present at Vista View was apparently placed in service at the time the building
was initially occupied at or around 1972. When installed the piping likely had a manufactured wall
thickness of about ¼ (0.25) inch. Exponent found no visual evidence of any type of interior coating
or protective layer within the pipe and has concluded that the pipe was likely placed into service
without any such protective coating (a common practice at the time).

Given the anticipated corrosion rate of iron of 0.01 to 0.03 ipy (as documented in the literature
search) in aqueous exposure, a 30-something year life of the iron piping in sewer service at Vista
View is reasonable.

Based on the inspection reports and video, Exponent believes the gravity sewer system in the Vista
View complex has reached or nearly reached the end of its useful life. In its current condition,
increased maintenance will be required to guard against blockages. Settlement at "bottom out"
locations will likely continue. The grease-filled conditions seen during Exponent's inspection in
January of 2009 indicate that a greater level of maintenance is required to prevent blockages.

Coincidentally, on January 20, 2009 during the Exponent/TDT joint inspection, a sewer backup
partially flooded unit 102 in Building C. When Exponent and TDT later inspected that location the
sewer serving that portion of the building was severely choked with grease. A sewer snake was
used by TDT to clear the blockage. Hot water was run in unit C-102 for approximately 20 minutes.

A single blockage that affected all the buildings at once had to have occurred in the main sewer line
leading from the main manhole west of building A, northbound to the city sewer. This is the
location where all the sewer pipes join together before flowing to the city system. Video inspection
of the this main sewer line leading from the main manhole west of building A has provided no
insight or answers as to how or why this might have occurred. This larger diameter line appears to
be flowing well.

Ms. Cindy Ebenfeld
April 7, 2009
Page 8


No first-party records have been provided to Exponent that demonstrate that the alleged incident of December 30, 2007, that affected all buildings, actually occurred, or what remedial action provided relief from the blockage.

If you have any questions, or if Exponent can be of additional assistance in this investigation or some other technical or materials problem, please do not hesitate to contact us.



Very truly yours,



David P. Wills, P.E.
Managing Engineer


Enclosures:        3 photos with captions, 3 illustrations with captions

Ms. Cindy Ebenfeld
April 7, 2009
Page 9



Photos 1 & 2:  Two views of building A in the Vista View complex of four residential buildings.

Ms. Cindy Ebenfeld
April 7, 2009
Page 10





Figures 1 & 2 (Vista View Brochure): These illustrations show the footprint of the project and the room numbering scheme.  The entry lobby is on the north for buildings A & D, and on the south for buildings B & C.

0805157/A000/0409/DW02

Ms. Cindy Ebenfeld
April 7, 2009
Page 11



Figure 3 (Exponent Drafting): This illustration shows (in blue) the routes of the underground sewer system at the Vista View Apartments. Cleanout numbers were arbitrarily assigned during Exponent's inspection.

Ms. Cindy Ebenfeld
April 7, 2009
Page 12



Photo 3 (Exponent File Photo):  This Y fitting is an example of a horizontally mounted iron sewer pipe that suffered a "bottom out" corrosion failure and was removed from service after about 35 years in a different South Florida apartment complex.  It has been inverted in this photo to better see the "bottom out" condition.  The bell (or socket) end on the left would have been protected by the adjacent iron pipe that was inserted within it….providing, locally, a double wall thickness.

IN THE UNTITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

### CASE NO. 08 – 22772 – CIV - KING

VISTA VIEW APARTMENTS, LTD.,

                        Petitioner,

vs.

CHUBB CUSTOM INSURANCE COMPANY,

                        Respondent.

_____/

### NOTICE OF CONVENTIONAL FILING

       COMES NOW the Petitioner, VISTA VIEW APARTMENTS, LTD., by and through its undersigned counsel and files its Notice of Conventional Filing and in support thereof states the following:

1. The undersigned counsel rarely makes appearances in this Honorable Court and has learned of the electronic filing requirement.

2. The necessary steps to begin utilizing this court's electronic filing system have been taken. However, due to recent and severe illness, the undersigned was forced to reschedule the training session.

       WHEREFORE, the undersigned respectfully requests that this Honorable Court allow conventional filings until he is able to make electronic filings.

Dated this _____ day of March, 2010.

                               Respectfully submitted,

                               Law Offices of Leo A. Manzanilla, P.A
                               770 Ponce de Leon Blvd., Suite 101
                               Coral Gables, FL 33134
                               Telephone: 305-444-1887
                               Facsimile:   305-666-8427

                               By: _____
                                 Leo A. Manzanilla, Esq.
                                 Florida Bar No. 065291

### CERTIFICATE OF SERVICE

       The undersigned certifies that and true and correct copy of the above and forgoing was served by US Mail on this ___ day of March, 2010, to Cindy L. Ebenfeld, Hicks & Kneale, P.A., attorneys for Respondent, 11011 Sheridan Street, Suite 104, Cooper City, FL 33026.

                               By: _____
                                 Leo A. Manzanilla, Esq.